STATE of Wisconsin, Plaintiff-Respondent,

v.

Jon P. BARREAU, Defendant-Appellant.†

Court of Appeals

*No. 01–1828–CR. Submitted on briefs March 14, 2002.—Decided July 11, 2002.*

## 2002 WI App 198

(Also reported in 651 N.W.2d 12.)

---

† Petition to review denied 9-26-02.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Glenn C. Reynolds* of *Reynolds & Associates*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general and *Sally L. Wellman*, assistant attorney general.

Before Vergeront, P.J., Dykman and Roggensack, JJ.

¶ 1. DYKMAN, J. Jon Barreau appeals from a judgment convicting him of first-degree intentional homicide, robbery with use of force, and burglary while armed with a dangerous weapon, each as a party to the crime. He raises three issues: (1) whether the circuit court erred in refusing to instruct the jury on the lesser included offense of first-degree reckless homicide; (2) whether the circuit court erred in admitting other acts evidence that Barreau had committed a burglary when he was thirteen years old; and (3) whether Barreau was denied his constitutional right of confrontation when the circuit court limited his cross-examination of one of the State's witnesses.

¶ 2. With regard to the first issue, because no reasonable view of the evidence both casts reasonable doubt on the first-degree intentional homicide charge and supports a guilty verdict for first-degree reckless homicide, we conclude that a jury instruction for reckless homicide was not required. With regard to the other acts evidence, we agree with Barreau that the evidence that he committed a burglary when he was thirteen years old was not relevant and therefore should not have been admitted. However, because there is no reasonable possibility that the error contributed to the conviction, we conclude that it was harmless error. Finally, with regard to Barreau's right of confrontation, we also conclude that to the extent the circuit court erroneously limited Barreau's cross-examination, the error was harmless. Accordingly, we affirm.

## BACKGROUND

¶ 3. On June 28, 1998, Jon Barreau and Jeffrey Keeran went into the residence of Robert Hansen, a friend of Barreau's father. When they left a few hours later, Hansen lay on the floor, covered in a sleeping bag, bleeding and either dead or dying, having been beaten on the head multiple times with a baseball bat and stabbed in the neck with a knife.

¶ 4. Four months later, the State charged Barreau with being party to the crime of first-degree intentional homicide in violation of Wis. Stat. §§ 940.01 and 939.05 (1995–96).[1] In addition, Barreau was charged with robbery with use of force and a dangerous weapon in

---

[1] All references to the Wisconsin Statutes are to the 1995–96 version unless otherwise noted. We note that pursuant to 1997 Wis. Act 295, effective July 1, 1998, Wis. Stat. § 940.01(1) was amended so that subsec. (1) was renum-

violation of WIS. STAT. § 943.32(1)(a) and (2) and armed burglary, in violation of WIS. STAT. § 943.10(2)(a), both as a party to the crime. Barreau pleaded not guilty to all charges.

¶ 5. At Barreau's jury trial, several witnesses testified about what occurred on the night that Hansen was killed. The State called Ryan Rockey, an acquaintance of Barreau, who testified that in late June 1998, he was walking through a cemetery with Barreau and Keeran, and Barreau confessed to him that he had committed a murder "a couple nights" earlier. Specifically, Barreau told Rockey that he killed "Uncle Hooter," a name Barreau called Hansen, because Hansen "was supposed to have a lot of money." Hiding two baseball bats in Keeran's pants, Barreau and Keeran knocked on Hansen's door, Hansen let them in and they talked for about an hour. Barreau took one of the bats and struck Hansen on the back of the head multiple times until the bat broke, when Keeran then used the other bat and continued striking Hansen.

¶ 6. According to Rockey, Barreau told him that he "got on top of" Hansen, held a knife to him and "asked him where the money was at." Barreau told Hansen not to move. When Hansen "twitched," Barreau stabbed Hansen in the neck. Afterwards, Barreau "cleaned up . . . for a couple hours," and then took a lock box before leaving. Rockey testified that Barreau was "nonchalant and proud" about what he did, and that Barreau told Rockey that it was his, not Keeran's idea, to take the baseball bats to Hansen's. On cross-examination, Rockey admitted that he was under the influence of LSD during the conversation with Barreau.

bered para. (1)(a) and para. (1)(b) was created. Under the revised numbering, Barreau would be charged under § 940.01(1)(a).

¶ 7. The State also called James Kremkowski, who lived with Barreau for a time. Kremkowski testified that in October 1998, Barreau told Kremkowski that, during the summer, he had driven to Madison with Keeran in order to "rob this dude" who was "a good friend of his famil[y]." Barreau "thought he had a large amount of money in the house." Barreau and Keeran took two baseball bats, which they "put . . . down their trousers," and knocked on Hansen's door. Hansen let them in and they talked for "about 45 minutes," after which "they beat him with baseball bats." Barreau hit Hansen "about 10" times. Barreau told Hansen "to stop twitching and he would live," and stabbed him in the throat when he did not stop. Barreau and Keeran covered Hansen's body and then "cleaned up their mess and all the evidence." They took twenty-eight dollars from Hansen's wallet and a twenty dollar bill from the safe. Keeran "was just kind of watching" during the attack, but he "did hit [Hansen] once with the ball bat" after Barreau threatened to kill Keeran if he refused to help.

¶ 8. Bruce Becker, a detective for the Madison Police Department, testified that in an interview with Barreau in October 1998, Barreau admitted that he had participated in beating Hansen. According to Becker, Barreau told him that he and Keeran brought two baseball bats with them to Hansen's residence, and that they had each hidden one of them in their pants. They knocked on the door, and Hansen answered and let them in. Barreau spoke to Hansen for about forty-five minutes. Barreau went into the bathroom, and when he came out, he saw Keeran striking Hansen with a baseball bat. Although Barreau was surprised, he pulled out his own bat "and struck Uncle Hooter three or four times in the head." Keeran's bat broke, so he took Barreau's bat and continued striking Hansen.

213

Keeran stopped beating Hansen, got a knife, and stabbed Hansen in the neck. Barreau covered Hansen with a sleeping bag, cleaned up the residence and took Hansen's wallet containing twenty-eight dollars and a lock box containing twenty dollars, a will, and a few gold coins.

¶ 9. Robert Huntington, a forensic pathologist, performed Hansen's autopsy, and prepared a report of his examination. He testified that there were "10 lacerations plus some other abrasions" "all over" Hansen's head, that these were each "blunt force blow injuries," and that the injuries were consistent with having been struck by a baseball bat. All of the blows penetrated Hansen's scalp "to some degree," and had caused bleeding in Hansen's brain, which was "evidence that those injuries had in effect reached deep into that brain." Huntington concluded that "to a reasonable medical certainty, and even past, [Hansen] was beaten to death."

¶ 10. When discussing the effect of each of the blows, Huntington stated:

> And I do not think it is reasonable to say that one to the exclusion of the others did a job. Yes, that one that got down deepest was able to apply more force, but good lord, he was hit a bunch of other times, and I do not think we can say with any honesty at all that those were plainly irrelevant because they didn't quite get as deep. They still were good solid hits.

In sum, Huntington testified that the type of injuries Hansen incurred were "usually" caused by multiple, rather than single blows. On cross-examination, Huntington further stated that "to say that any of the wacks that he got were irrelevant is not reasonable."

¶ 11. In addition to the injuries on Hansen's head, Huntington also observed that Hansen had sustained a broken nose, lacerations on his face, and bruises on his

214

arms and hands. Huntington could not identify precisely when Hansen died.

¶ 12. Barreau testified on his own behalf. He testified that he and Keeran went to Hansen's because they "were both pretty thirsty" and remembered that Hansen, a friend of Barreau's father, lived nearby. They had two baseball bats with them that they had taken from Keeran's garage. Keeran kept both bats, one down each pant leg. Barreau told Keeran to "get rid of" the bats before they went inside.

¶ 13. Hansen let Barreau and Keeran in, and offered them sodas. After talking to Hansen for awhile, Barreau went to use the restroom. When he came out, Keeran was striking Hansen on the head with a baseball bat. Barreau asked Keeran, "What the fuck's going on?" Keeran did not respond and continued striking Hansen. Barreau testified that he "didn't really know what to do." Hansen grabbed for Barreau's ankle, and Barreau tried to push him away. Keeran broke his bat over Hansen's head, after which he took the other bat and continued striking Hansen "until Mr. Hansen stopped trying to get up."

¶ 14. Barreau testified that he started to move toward the back door. Keeran ran past him, and took a knife from the kitchen. Barreau saw Keeran making "a stabbing motion" toward Hansen. Keeran grabbed Barreau's shoulder, and told Barreau, "You better start cleaning this place up." Because Keeran had a bat in one hand and a knife in the other hand, Barreau complied. Barreau covered up Hansen and could still hear Hansen breathing. Keeran came out of the bedroom carrying a metal box. Keeran told Barreau to rip out the phone cord. Barreau complied "in case Mr. Hansen was going to call the cops," and then the two men left.

¶ 15. The jury found Barreau guilty of all three crimes. The circuit court denied Barreau's postconviction motion and Barreau appeals.

## DECISION

### A. *Jury Instruction for Reckless Homicide*

¶ 16. Barreau was tried for three crimes, one of which was being party to first-degree intentional homicide. At trial, Barreau requested a jury instruction for the lesser included offenses of first- and second-degree reckless homicide, but the circuit court denied the request. Barreau argues on appeal that the court erred in refusing to instruct the jury on first-degree reckless homicide.

¶ 17. Although generally the circuit court has wide discretion with respect to giving jury instructions, *State v. Waites*, 158 Wis. 2d 376, 383, 462 N.W.2d 206 (1990), whether the evidence required the circuit court to give an instruction on a lesser included offense is a question of law that we review de novo, *State v. Jones*, 228 Wis. 2d 593, 598, 598 N.W.2d 259 (Ct. App. 1999). The State does not dispute, and we agree, that reckless homicide is a lesser included offense of intentional homicide. *See* WIS. STAT. § 939.66(2); *see also State v. Chapman*, 175 Wis. 2d 231, 241, 499 N.W.2d 222 (Ct. App. 1993) ("[E]very degree of homicide is a lesser included offense of first-degree intentional homicide.") Therefore, the question is whether under the evidence presented at trial, there were reasonable grounds for both acquittal on first-degree intentional homicide and conviction on first-degree reckless homicide. *See State v. Glenn*, 199 Wis. 2d 575, 585, 545 N.W.2d 230 (1996). In

216

other words, if a reasonable view of the evidence both casts reasonable doubt on the first-degree intentional homicide charge *and* supports a guilty verdict for first-degree reckless homicide, then we must conclude that the circuit court erred in declining to submit jury instructions on both offenses. *See State v. Muentner*, 138 Wis. 2d 374, 385, 406 N.W.2d 415 (1987). In making this determination, we view the evidence in the light most favorable to the defendant. *State v. Schuman*, 226 Wis. 2d 398, 403, 595 N.W.2d 86 (Ct. App. 1999).

■

¶ 18. A person commits first-degree intentional homicide when he or she "causes the death of another human being with intent to kill that person or another." Wis. Stat. § 940.01(1). " 'With intent to' . . . means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result." Wis. Stat. § 939.23(4). Because Barreau was charged as being a party to first-degree intentional homicide, the State was required to prove *either* that Barreau intended to kill Hansen *or* that Barreau intentionally aided and abetted someone else who intended to kill Hansen. *See* Wis. Stat. § 939.05. To intentionally aid and abet Keeran in first-degree intentional homicide, Barreau must have: (1) known that Keeran intended to kill Hansen; and (2) had the purpose to assist Keeran in committing that crime. *See* Wis JI—Criminal 400 (Rel. No. 32–11/94). Barreau concedes that, under this standard, the State needed to prove only that Barreau *or* Keeran had intent to kill Hansen in order to prove that Barreau was a party to first-degree intentional homicide.

¶ 19. A person commits first-degree reckless homicide when he or she "recklessly causes the death of another human being under circumstances which show

utter disregard for human life." Wis. Stat. § 940.02(1). In this context, recklessness means "that the actor creates an unreasonable and substantial risk of death or great bodily harm to another human being and the actor is aware of that risk." Wis. Stat. § 939.24(1) and (2).

¶ 20. To support his argument that the jury should have received an instruction on reckless homicide, Barreau relies on evidence that: (1) Hansen was still alive immediately after the beating; (2) "Barreau and Keeran" took the phone cord out of the wall; and (3) only two of the blows that Hansen received from the bat were sufficient to kill him. He contends that a reasonable view of this evidence could create a reasonable doubt that either Barreau or Keeran intended to kill Hansen and also permit the jury to conclude that Barreau acted recklessly under circumstances which demonstrate utter disregard for human life.[2]

---

[2] As noted above, Barreau initially concedes in his brief that the issue is whether Barreau *or* Keeran had intent to kill Hansen. However, in other instances, Barreau characterizes the issue as whether Barreau *only* intended to kill Hansen, without considering Keeran's intent. Further, in his argument that there was sufficient evidence to require a reckless homicide instruction, Barreau states: "Barreau testified that he did not intend to kill Hansen and that he took no part in the beating."

Barreau's emphasis on his own intent alone is confusing since he recognizes that under a party to a crime charge, that defendant's intent to kill is not determinative. *See State v. Asfoor*, 75 Wis. 2d 411, 430, 249 N.W.2d 529 (1977) ("[O]ne who intentionally aids and abets the commission of a crime is responsible not only for the intended crime, . . . but as well for other crimes which are committed as a natural and probable consequence of the intended criminal acts."); *see also State v. Glenn*, 199 Wis. 2d 575, 588, 545 N.W.2d 230 (1996). Further, to

¶ 21. With regard to the evidence that Hansen was not dead when Barreau and Keeran left the house, whether or not Hansen actually *was* dead immediately after the beating and stabbing provides little insight into whether Barreau or Keeran purposefully caused Hansen to die or were practically certain that he would. The best argument that Barreau has in this respect is that both Barreau and Keeran *believed* that Hansen was still alive when they left the house and still decided not to harm him any further. That Barreau believed this is supported at least by his ripping the phone cord out of the wall to prevent Hansen from calling anyone.

¶ 22. But even this does not get Barreau very far. Although a reasonable view of the evidence suggests that Barreau and Keeran believed Hansen was not yet dead when they fled the house, there is no evidence indicating that they believed Hansen would ultimately survive. Barreau seems to suggest that a defendant is entitled to a reckless homicide instruction any time he or she left the scene of the crime while the victim was still alive. Barreau points to no authority for such a proposition and we are unaware of any.

¶ 23. When someone beats another *over the head* at least ten times with a baseball bat and then stabs him in the neck with a knife, what could the expectation be, other than that the victim will die? If the

the extent that Barreau is arguing that there is evidence that he did not aid and abet Keeran, but rather was only a bystander, this may support a finding of not guilty but it does not support a conviction for reckless homicide. Accordingly, we cannot consider that evidence. *See State v. Borrell*, 167 Wis. 2d 749, 780, 482 N.W.2d 883 (1992); *State v. Wilson*, 149 Wis. 2d 878, 899–901, 440 N.W.2d 534 (1989). Barreau made this argument to the jury and they rejected it, and Barreau does not ask us to review that decision here.

assailant (either Barreau or Keeran or both) intended, as Barreau argues, to merely incapacitate Hansen without killing him, why strike him repeatedly on his skull? If only injury was intended, why stab the victim in the neck, even after he was clearly incapacitated? Barreau provides no explanation for these questions.

¶ 24. Barreau argues that there is evidence that at least two of the blows that Hansen received were *alone* sufficient to kill him. He contends that because not *every* blow was sufficient to cause death, this suggests that he acted recklessly rather than intentionally. We disagree. How many blows of deadly force must one inflict before it is no longer reasonable to believe that the assailant intended injury rather than death? It is well settled that when one aims and shoots a loaded gun even once at a "vital part" of another's body, the only reasonable inference is that death was intended. *See State v. Kramar*, 149 Wis. 2d 767, 793, 440 N.W.2d 317 (1989). Although the assailant in this case used a baseball bat and not a gun, considering the part of Hansen's body that was targeted, the number and force of blows that were used, and the stabbing of Hansen's neck with a knife, there is no reasonable view of the evidence that would support a conviction for reckless homicide rather than intentional homicide.

¶ 25. With respect to the phone cord, we do not believe that, given the circumstances of this case, the fact that either Barreau or Keeran pulled the phone cord out of the wall creates a reasonable inference that Hansen was killed recklessly rather than intentionally. If anything, it suggests even more strongly an intent to kill. Barreau writes: "[A] reasonable juror could conclude that Barreau ripped out the phone cord because he knew the victim was alive, thereby negating a finding of conscious intent that is required for a first-

degree homicide conviction," and "[w]hen Barreau and Keeran fled, they yanked the telephone cord out of the wall to prevent Hansen from making outgoing phone calls and soliciting outside help."

¶ 26. We agree with Barreau that it is a reasonable inference that he and Keeran believed that Hansen was still alive when they fled the house and wanted to prevent him from calling for help. But we do not see how wanting to prevent Hansen from seeking help demonstrates recklessness rather than intent. Presumably, Barreau's argument is that he and Keeran believed that Hansen would survive and they needed to stop him from reporting them to the police. However, if Barreau and Keeran thought that Hansen would live, then they would have also realized that ripping out his phone cord would be at best a temporary barrier to outside communication and that eventually Hansen would report what Barreau and Keeran had done and they would be caught anyway. Under Barreau's view of the evidence, pulling out the phone cord would have been a pointless exercise. Although we are required to view the evidence in the light most favorable to Barreau, this does not extend to adopting unreasonable interpretations of the evidence. To the extent that pulling out the phone cord indicates anything, it is that Barreau and Keeran believed that Hansen was still alive or at least might be, but also believed he would soon die and wanted to insure that he could not seek medical treatment (*or* report them to the police) before he died.

¶ 27. No reasonable view of the evidence both casts reasonable doubt on the first-degree homicide charge and supports a guilty verdict for first-degree reckless homicide. Therefore, the circuit court did not err in refusing to instruct the jury on first-degree reckless homicide.

¶ 28. *Wangerin v. State*, 73 Wis. 2d 427, 243 N.W.2d 448 (1976), and *State v. Edmunds*, 229 Wis. 2d 67, 598 N.W.2d 290 (Ct. App. 1999), two cases upon which Barreau relies, do not suggest a different result. Both of these cases addressed only whether there was sufficient evidence to prove that the defendant acted recklessly. The question was not whether a defendant charged with a greater offense should have been given a jury instruction on a lesser included offense. Further, the facts in *Wangerin* involved a defendant who *punched* his victim, 73 Wis. 2d at 430, and *Edmunds* was a "shaken baby syndrome" case, 229 Wis. 2d at 71. We therefore do not view either *Edmunds* or *Wangerin* as instructive.

## B. Other Acts Evidence

¶ 29. During his direct examination, counsel for Barreau asked him, "Mr. Barreau, in June of 1998 did you at any time come to Madison with the intent to rob Robert Hansen?" Barreau replied, "Never. Never would." Rather than cross-examine Barreau regarding this statement as permitted by Wis. Stat. § 906.08(2), the State asked the court for permission to introduce extrinsic evidence during rebuttal that would show that Barreau had entered a house for the purpose of stealing money in 1992, when Barreau was thirteen years old. Over Barreau's objection, the circuit court permitted the evidence, concluding that the evidence was admissible under Wis. Stat. § 904.04(2), because it was relevant to Barreau's intent to steal.

¶ 30. The State called Jason Stahelski who testified that when Barreau was thirteen years old, he asked Stahelski to skip school with him so that they could break into a house and steal money from the inside. He

further testified that while they did enter the house, they did not find any money. The State also called Thomas Colby, who is a detective with the Madison Police Department. Colby testified that in 1992, he spoke with Barreau, who told Colby that he had entered a residence without permission and for the purpose of stealing $400.

¶ 31. Barreau renews his objection on appeal, arguing that the evidence was not offered for an acceptable purpose and that, to the extent it was relevant, its probative value was substantially outweighed by the danger of unfair prejudice. We review a circuit court's decision to admit evidence for an erroneous exercise of discretion. *State v. Guzman*, 2001 WI App 54, ¶ 19, 241 Wis. 2d 310, 624 N.W.2d 717, *review denied*, 2001 WI 88, 246 Wis. 2d 166, 630 N.W.2d 219 (Wis. May 8, 2001) (No. 99–2249–CR). We will therefore uphold the ruling if there is a reasonable basis for it. *Id.*

¶ 32. Under Wis. Stat. § 904.04(2), evidence of prior bad acts "is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." However, § 904.04(2) permits use of prior bad acts for other purposes, such as proof of intent.

¶ 33. First, we reject the State's contention that the testimony of Stahelski and Colby was admissible "to rebut Barreau's testimony that he 'never would' do that and that he only went to [Hansen]'s house that night to get a drink." Although Wis. Stat. § 906.08(2) would permit the State to impeach Barreau's statement that he "never would" steal through *cross-examination,* § 906.08(2) expressly prohibits using *extrinsic* evidence of specific instances of conduct to attack a witness's credibility.

¶ 34. We also disagree with the State that the other acts evidence was admissible under Wis. Stat. § 904.04(2). As both parties recognize, the test for admitting evidence under § 904.04(2) is whether: (1) the other acts evidence was offered for an acceptable purpose; (2) the evidence is relevant under Wis. Stat. § 904.01; and (3) the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion or delay. *State v. Gribble*, 2001 WI App 227, ¶ 39, 248 Wis. 2d 409, 636 N.W.2d 488, *review denied*, 2002 WI 2, 249 Wis. 2d 580, 638 N.W.2d 488 (Wis. Dec. 17, 2001) (No. 00–1821–CR) (citing *State v. Sullivan*, 216 Wis. 2d 768, 772–73, 576 N.W.2d 30 (1998)). The burden is on the State to demonstrate that the test is satisfied. *Sullivan*, 216 Wis. 2d at 774. Assuming without deciding that the other acts evidence was offered for the acceptable purpose of showing intent, we conclude that the State has failed to show that the other acts evidence was relevant.

¶ 35. The test for relevancy is divided into two inquiries. The first question is whether the other acts evidence relates to a fact or proposition that is of consequence to the determination of the action. *Id.* at 772. The second question is whether the evidence has a tendency to make the consequential fact or proposition more probable or less probable than it would be without the evidence. *Id.*[3]

_____

[3] A preliminary question is whether the evidence is sufficient to show relevancy. *State v. Gray*, 225 Wis. 2d 39, 59, 590 N.W.2d 918 (1999). The evidence need not be in the form of a conviction so long as a reasonable jury could find by a prepon-

¶ 36. With respect to the first question, the parties agree that the testimonies of Stahelski and Colby relate to Barreau's intent to steal. Intent to steal is an element of burglary and robbery, both of which Barreau was convicted. *See* WIS JI—CRIMINAL 1421 (Rel. No. 39–4/2001); WIS JI—CRIMINAL 1475 (Rel. No. 31–1/94). Barreau's intent to steal is therefore a fact of consequence. *See Gribble*, 2001 WI App 227 at ¶ 48.

¶ 37. With respect to the second question, the probative value of the other acts evidence depends on its nearness in time, place and circumstances to the alleged crime. *Sullivan*, 216 Wis. 2d at 786. "The greater the similarity, complexity and distinctiveness of the events, the stronger is the case for admission of the other acts evidence." *Id.* at 787. In the case before us, the alleged prior burglary took place more than six years before the night Barreau went to Hansen's residence. Although this is a significant period of time, as the State points out, this time span alone does not make the evidence of the prior conduct irrelevant as a matter of law. *See State v. Plymesser*, 172 Wis. 2d 583, 596, 493 N.W.2d 367 (1992); *State v. Kuntz*, 160 Wis. 2d 722, 744, 749, 467 N.W.2d 531 (1991); *State v. Tabor*, 191 Wis. 2d 482, 495, 529 N.W.2d 915 (Ct. App. 1995).

¶ 38. We must also take into consideration, however, the fact that Barreau was thirteen years old when the prior acts allegedly took place. The difference between a thirteen year old and a twenty year old is

derance of the evidence that the defendant committed the other act. *Id.* Barreau does not challenge the sufficiency of the other acts evidence, so we do not consider that issue.

much more significant than the difference between someone who is thirty-three and someone who is forty. Because of the considerable changes in character that most individuals experience between childhood and adulthood, behavior that occurred when the defendant was a minor is much less probative than behavior that occurred while the defendant was an adult. *See Roberts v. State*, 634 S.W.2d 767 (Tex. Crim. App. 1982); EDWARD J. IMWINKLRIED, UNCHARGED MISCONDUCT § 8.08 at 27 (1999).

¶ 39. Even where evidence is too remote, however, it may still be relevant if there is a strong similarity between the two incidents. *State v. Hammer*, 2000 WI 92, ¶ 33, 236 Wis. 2d 686, 613 N.W.2d 629. We do not see a strong similarity between the prior acts and the charged offenses. Like *Sullivan*, which also concluded that the State had failed to show that the other acts evidence was relevant, the State's comparison involves only one, or at most two other incidents, and "the factual descriptions of the incidents do not involve particularly complex or unusual facts." *Sullivan*, 216 Wis. 2d at 788. In fact, other than that both incidents involved intent to steal from a residence, the State demonstrates virtually no other similarities between the two.

¶ 40. To the extent that the State is requesting that we adopt a rule in which *all* past conduct involving an element of the present crime is admissible under WIS. STAT. § 904.04(2), we must decline. "The general policy of § 904.04(2), STATS., is one of *exclusion* . . . ." *State v. Johnson*, 184 Wis. 2d 324, 336, 516 N.W.2d 463 (Ct. App. 1994) (emphasis added). To adopt such a broad standard of relevancy would allow the exception

to swallow the rule and permit parties to introduce character evidence under the guise of another purpose. However, if the other acts evidence is probative of nothing more than the defendant's propensity to act a certain way, the evidence is not admissible. *See* 7 Daniel D. Blinka, WISCONSIN PRACTICE: WISCONSIN EVI-DENCE, § 404.6 at 149 (2001) (citing *State v. Goldsmith*, 122 Wis. 2d 754, 364 N.W.2d 178 (Ct. App. 1985)). We cannot conclude that evidence that a defendant intended to steal from a residence as a child is probative of intent to steal in every future occasion where the defendant enters a residence or that the two acts are " 'so closely connected with that charge as to tend to directly show the intent characterizing the latter.' " *State v. Reynolds*, 28 Wis. 2d 350, 357 n.9, 137 N.W.2d 14 (1965) (quoting *Baker v. State*, 120 Wis. 135, 145, 97 N.W. 566 (1903)).

¶ 41. Because the alleged prior acts occurred more than six years before, when Barreau was thirteen years old, and because of the lack of similarity between the acts, we conclude that the evidence lacks probative value and the circuit court erroneously exercised its discretion in admitting the other acts evidence. We therefore need not consider the third step of the *Sullivan* test. *See Sullivan*, 216 Wis. 2d at 789.

■■■■■

¶ 42. We disagree with Barreau, however, that this error requires reversal. An erroneous admission of other acts evidence is subject to a harmless error analysis. *State v. Thomas*, 228 Wis. 2d 868, 873, 599 N.W.2d 84 (Ct. App. 1999). Under this test, Barreau is entitled to a new trial unless the State can show that there is no reasonable possibility that the error contributed to the conviction. *Id.* We must evaluate the error in the context of the entire trial and consider the strength of untainted evidence. *Id.*

¶ 43. We agree with the State that, at least with respect to the charge of first-degree intentional homicide, Barreau's alleged prior bad acts were a minor part of the prosecution's case. We are convinced that there is no reasonable possibility that evidence that Barreau was involved in a burglary when he was thirteen years old influenced the jury to find Barreau guilty of being a party to first-degree intentional homicide.

¶ 44. On its face, the evidence of the prior burglary seems more likely to have potentially contributed to at least the burglary conviction. In the context of this case, however, there is no reasonable possibility that Barreau's actions as a thirteen year old contributed to any of his convictions. The evidence regarding all three of Barreau's charges was closely tied together. The alleged purpose of killing Hansen was to steal from him. Taking the prior acts evidence out would still leave the testimony of Rockey and Kremkowski, who both testified that Barreau confessed to them that he had gone to Hansen's residence for the purpose of robbing him and then murdered him in the process. We do not believe that it is reasonable to assume that that jury would disbelieve Barreau rather than Rockey and Kremkowski regarding the homicide, burglary, and robbery based solely on testimony regarding a juvenile burglary. We therefore conclude that admitting the other acts evidence was harmless error.

## C. Right of Confrontation

¶ 45. Before Ryan Rockey testified before the jury, counsel for Barreau conducted a voir dire to explore potential issues of bias. Rockey admitted that he did not come forward with information about Barreau's in-

volvement in Hansen's death until after the State charged Rockey with forgery and drug trafficking. Counsel for Barreau asked Rockey, "Are you anticipating that your helping the State out here might help you out in those case[s]?" Rockey answered, "No." When the questioning about the pending criminal charges became more specific, Rockey invoked his Fifth Amendment privilege against self-incrimination. In response, counsel for Barreau requested that Rockey be prohibited from testifying because, otherwise, Barreau would be denied his right to confront Rockey about potential bias.

¶ 46. The court denied Barreau's request. It concluded that it would permit questioning regarding whether Rockey "is a close personal friend or social acquaintance of Mr. Keeran's" but that it would prohibit questions involving "the nature of any criminal activity that allegedly [Rockey and Keeran] may be engaging in." The court also prohibited "any questions regarding whether or not this witness is receiving any benefits as a result of the testimony since he's indicated that he has had no promises made to him and no inducements." Barreau now argues that the circuit court erred by "preclud[ing] trial counsel from questioning Rockey regarding (1) his pending charges, (2) his involvement with Jeffrey Keeran in the forgery offense, and (3) his subjective expectation of favorable treatment in exchange for his testimony."

¶ 47. A Wisconsin criminal defendant's right to confront witnesses is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution[4] and article I, section 7 of the Wisconsin

---

[4] The Sixth Amendment provides in part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be con-

Constitution.[5] The supreme court has held that "the confrontation rights under both constitutions are the same." *State v. Burns*, 112 Wis. 2d 131, 144, 332 N.W.2d 757 (1983). The right of confrontation includes the right to cross-examine adverse witnesses to expose potential bias. *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986). Although the circuit court may limit cross-examination when it seeks only irrelevant evidence, *State v. St. George*, 2002 WI 50, at ¶ 15, 252 Wis. 2d 499, 643 N.W.2d 777, the Supreme Court has held that the "partiality of a witness . . . is *always* relevant as discrediting the witness and affecting the weight of his testimony." *Davis v. Alaska*, 415 U.S. 308, 316 (1974) (emphasis added) (internal quotations omitted). Therefore, while reasonable limitations on "interrogation that is repetitive or only marginally relevant" is appropriate, a court may not prohibit *all* inquiry into the possibility of bias. *Van Arsdsall*, 475 U.S. at 679. The fundamental inquiry in deciding whether the right of confrontation was violated is whether the defendant had the opportunity for effective cross-examination. *See Delaware v. Fensterer*, 474 U.S. 15, 20 (1985); *State v. Pulizzano*, 155 Wis. 2d 633, 645, 456 N.W.2d 325 (1990).

¶ 48. Generally the decision to admit or exclude evidence is within the circuit court's discretion. *State v. Williams*, 2002 WI 58, at ¶ 7, 253 Wis. 2d 99, 644 N.W.2d 919. However, this discretion may not be exercised until the court has accommodated the defendant's

---

fronted with the witnesses against him." The Sixth Amendment applies to the states by virtue of the Fourteenth Amendment. *See Pointer v. Texas*, 380 U.S. 400, 406 (1965).

[5] Article I, section 7 provides in part: "In all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face."

right of confrontation. *See George*, 2002 WI 50 at ¶ 16 n.17 (citing *State v. Johnson*, 118 Wis. 2d 472, 479, 348 N.W.2d 196 (Ct. App. 1984)). Whether the limitation of cross-examination violates the defendant's right of confrontation is a question of law that we review de novo. *See Williams*, 2002 WI 58 at ¶ 7.

¶ 49. Barreau's right of confrontation argument potentially raises at least three issues. First, was the testimony that Barreau sought to elicit from Rockey relevant? Second, did the circuit court err in concluding that Rockey was justified in invoking his Fifth Amendment privilege? Third, if the privilege was appropriately invoked, did Barreau have an opportunity to effectively cross-examine Rockey?

¶ 50. With regard to the pending charges against Rockey and Keeran for forgery, counsel for Barreau argued before the circuit court that cross-examining Rockey in detail about these charges was necessary to demonstrate that Rockey had a bias in favor of Keeran. Specifically, counsel argued:

> Well, the bias stems from if Mr. Rockey is involved with Mr. Keeran in another crime, so to speak, or another action for which he feels a reason to—it goes to show that he has reason to protect Mr. Keeran from negative consequences, that he doesn't have that reason involving Mr. Barreau. It shows an alliance between the two that clearly goes to his credibility as far as when he's saying [Keeran] said this in this case or [Barreau] said that.
>
> . . . .
>
> My information is that the charges that are pending involve forgery, that Mr. Keeran was along when Mr. Rockey attempted to or did gain—I don't know for sure which one it was—access to his brother's account,

231

so that Mr. Keeran was at least arguably a party to the crime. That shows a connection between those two as potential co-defendants. Even if they are not charged, that gives him a reason to protect or minimize Mr. Keeran's involvement and to emphasize somebody else's.

¶ 51. We agree with Barreau that evidence that Rockey and Keeran were involved in criminal conduct together could create an incentive for Rockey to shift the blame of the murder to Barreau rather than Keeran. Because it suggests potential bias, the evidence is relevant. *See Davis*, 415 U.S. at 316. On the other hand, Rockey had a "real and appreciable apprehension" that testimony regarding the pending charges could be used against him in a criminal proceeding, and therefore had a right to invoke his Fifth Amendment privilege. *See State v. Hall*, 207 Wis. 2d 54, 68, 557 N.W.2d 778 (1997). Even where the defendant's right of confrontation may be implicated, a witness cannot be compelled to waive his or her privilege against self-incrimination. *United States v. Boyett*, 923 F.2d 378, 379 (5th Cir. 1991).

¶ 52. However, when cross-examination is restricted by a witness's invocation of the Fifth Amendment, "courts must watch vigilantly to ensure that the invocation did not effectively emasculate the right of cross-examination itself." *United States v. Zapata*, 871 F.2d 616, 623 (7th Cir. 1989) (ellipses and internal quotations omitted). Therefore, when the privilege prevents a defendant " 'from directly assailing the truth of the witness' testimony,' " it may be necessary in some cases to prohibit that witness from testifying or to strike portions of the testimony if the witness has already testified. *Id.* (quoting *United States v. Hum-*

*phrey*, 696 F.2d 72, 75 (8th Cir. 1982)); *see also Lawson v. Murray*, 837 F.2d 653, 656 (4th Cir. 1988) ("Striking all of the testimony of the witness may be the only appropriate remedy when refusal to answer the questions of the cross-examiner frustrates the purpose of the process.").

¶ 53. But this does not mean a defendant's right of confrontation is denied in each instance that potentially relevant evidence is excluded.[6] The ultimate question is whether Barreau was denied the opportunity to. effectively cross-examine Rockey. When the record shows that the witness's credibility was adequately tested, the defendant's right of confrontation has not been violated. *West v. State*, 74 Wis. 2d 390, 402–03, 246 N.W.2d 675 (1976); *State v. Robinson*, 145 Wis. 2d 273, 286, 426 N.W.2d 606 (Ct. App. 1988); *see also United States v. Kaufmann*, 985 F.2d 884, 897 (7th Cir. 1993) ("Whether a defendant has the ability to effectively cross-examine a witness turns on whether the jury has sufficient information to make a discriminating appraisal of a witness's motive and bias.")[7] (internal quotations omitted).

¶ 54. We conclude that Barreau had the opportunity to effectively cross-examine Rockey regarding potential bias in favor of Keeran. The circuit court per-

---

[6] Barreau does not argue that the circuit court erred as an evidentiary matter so we do not address that issue.

[7] In making this determination, federal courts have also considered whether the witness's assertion of the Fifth Amendment privilege related to details of the direction examination or collateral matters, relating to credibility in general. *See, e.g., United States v. Brooks*, 82 F.3d 50, 54 (2d Cir. 1996); *United States v. Curry*, 993 F.2d 43, 45 (4th Cir. 1993).

mitted Barreau to question Rockey regarding his friendship with Keeran, and Barreau took full advantage of this opportunity. On cross-examination Rockey testified that he was "pretty close" to Keeran, that Keeran was one of his best friends, and that they had lived together at Keeran's parents' house. We are not persuaded that the inclusion of evidence that Keeran and Rockey may have been involved in criminal activity together would have affected the jury's appraisal of Rockey's credibility as such evidence would have been largely cumulative. Therefore, Barreau had an opportunity to effectively cross-examine Rockey regarding his bias in favor of Keeran.

¶ 55. With respect to Rockey's pending charges and his "subjective expectation of favorable treatment in exchange for his testimony," we agree with Barreau that because the right of confrontation includes the right to reveal potential bias, defendants must be permitted to cross-examine witnesses regarding motives for testifying for the State. It is generally recognized that evidence of pending charges against a witness, even absent promises of leniency, may reveal "a prototypical form of bias." *See United States v. Anderson*, 881 F.2d 1128, 1138 (D.C. Cir. 1989) (quoting *Van Arsdall*, 475 U.S. at 680); *see also Kaufmann*, 985 F.2d at 897–98; *United States v. Beale*, 921 F.2d 1412, 1424 (11th Cir. 1991). "'To require evidence of an actual cooperation agreement between [the government and the witness], overlooks the inherent and independent relevance of the *mere fact* of a . . . charge, a charge which hung over the witness' head like the sword of Damocles . . . ." *Anderson*, 881 F.2d at 1139.

¶ 56. Despite Barreau's suggestion in his brief to the contrary, however, the circuit court did *not* prohibit

Barreau from asking Rockey *whether* criminal charges were pending against him or from asking Rockey when he first provided the State with the information about Barreau's involvement in Hansen's death. For the purpose of demonstrating potential bias in favor of the State, it was only necessary that Barreau reveal that charges were in fact pending against Rockey and that it was after the complaint was issued that Rockey agreed to testify in Barreau's case. Counsel for Barreau did not ask Rockey these questions in front of the jury, either because she misunderstood the court's ruling or for a tactical reason. But the right of confrontation guarantees only an *opportunity* for effective cross-examination. The right is not violated when counsel chooses not to ask a question.

¶ 57. The circuit court *did* prohibit Barreau from asking Rockey whether he was receiving any benefits from the State in exchange for his testimony. The court reasoned that the evidence would not be "particularly probative" because Rockey had testified outside the jury's presence that he had not received a benefit. We agree that testimony from Rockey that he was not receiving a benefit from the State would not aid Barreau in demonstrating potential bias. "A reasonable jury [would not] have received a significantly different impression of [Rockey]'s credibility had [Barreau]'s counsel been permitted to pursue [her] proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680. Therefore, to the extent that the court erred in prohibiting this questioning, we conclude that the error was harmless.

*By the Court.*—Judgment affirmed.