COURT OF APPEALS
DECISION
DATED AND FILED

March 23, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP58-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF325

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

JESSE RAY LLOYD,

  DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Chippewa County: JAMES M. ISAACSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Jesse Lloyd appeals from an amended judgment convicting him of conspiracy to commit armed robbery and possession of a

firearm by a felon. The sole issue on appeal is whether the circuit court erred by refusing to provide a jury instruction on the lesser included offense of conspiracy to commit robbery by threat of force. We conclude the evidence at trial did not warrant an instruction on the lesser included offense and therefore affirm.

## BACKGROUND

¶2 The State charged Lloyd with first-degree intentional homicide as party to a crime; conspiracy to commit armed robbery with use of force; and possession of a firearm by a felon, all in connection with the shooting death of Kenneth Patterson. The key witness at trial was Lloyd's alleged co-conspirator, Matthew LaBrec. The jury instruction issue turns largely on whether there were reasonable grounds to accept part, but not all, of LaBrec's account of events— particularly as to who wielded the gun that fired the fatal shot. We will therefore set forth LaBrec's testimony in detail, followed by shorter summaries of other evidence that supported or undermined LaBrec's testimony on various points.

¶3 LaBrec appeared as a witness for the State after being given a favorable plea deal and testimonial immunity. LaBrec testified he made plans with Lloyd to rob Patterson because they needed money for drugs and Patterson had ripped off LaBrec in a drug deal a couple months earlier. The plan involved the use of firearms as an "equalizer" because Patterson was bigger than either LaBrec or Lloyd, and LaBrec feared they would be at a disadvantage if it came to a physical confrontation with Patterson. LaBrec planned to arm himself with a modified .22 rifle with a cutoff barrel, and Lloyd planned to arm himself with a purple and white .380 Cobra handgun. The two planned to threaten Patterson with their guns to get his money, but not to shoot Patterson unless Patterson attacked them.

¶4    Lloyd had stolen the Cobra within the week before the attempted robbery. LaBrec described the Cobra as a cheap gun that would sometimes jam up and had something wrong with the firing pin. LaBrec bought an extended clip for the Cobra on Lloyd's behalf, but he returned it because it would not fit that model. Lloyd and LaBrec also attempted to buy ammunition for the Cobra, but they were unable to complete the transaction because they were underage. Lloyd subsequently got another person, Robert Scherer, to buy ammunition for him.

¶5    LaBrec had gotten his rifle by trading methamphetamine for it. The stock broke off the back of the rifle, so LaBrec used electrical tape to wrap the stock and keep the loading mechanism in place. LaBrec admitted that he was trying to buy a working gun before the attempted armed robbery, and that Lloyd had tried to sell the Cobra on the day of the attempted armed robbery. LaBrec, however, denied on cross-examination that he had bought the Cobra from Lloyd or traded him for it. Still, LaBrec knew Lloyd would let him use the Cobra if he wanted to do so.

¶6    LaBrec said he lured Patterson to a secluded place by telling Patterson that LaBrec's drug dealer would give Patterson cheaper methamphetamine if Patterson met with the drug dealer personally. LaBrec chose a new residential development as the robbery site because he thought there would not be cameras there. Lloyd and LaBrec picked Patterson up in Lloyd's car, and Lloyd drove all three of them to a house under construction in the development. The three exited the car and headed toward the back of the house. As they walked, LaBrec prepared to pull out his rifle from a neoprene carrier bag; meanwhile, it was too dark for him to see when Lloyd pulled out his handgun. When they reached the back of the house, LaBrec and Lloyd both put their guns up, and Lloyd's gun discharged before anyone said anything. LaBrec thought the

discharge was accidental, due to the "weird" or "hairpin" firing pin on the Cobra's trigger combined with Lloyd's nervousness or adrenaline. Lloyd subsequently told LaBrec that he did not know why he shot Patterson, saying, "It just happened."

¶7 After Lloyd's gun discharged, Patterson fell or stumbled back against some bushes, said "What the hell, Jesse," and began running. Lloyd "shot some more" as Patterson ran away. LaBrec tried to fire his rifle as well, but the electrical tape wrapped around the stock blocked the safety, and a portion of the taped loading mechanism fell off as LaBrec ran alongside the house following Patterson. LaBrec tried to retrieve the dropped piece of his rifle, but he could not find it in the dark. Patterson ran out of sight while LaBrec was searching for the dropped piece. LaBrec then met up with Lloyd in the car in front of the house. They decided not to continue searching for Patterson because law enforcement could be on its way, so they left.

¶8 Lloyd and LaBrec drove from the scene of the shooting to Ryley Clark's house to procure some methamphetamine. LaBrec went in and told Clark in front of Kayle LaRose, who was at Clark's house, that he had just shot "K.P." and was going to leave the state. LaBrec testified that he lied in front of LaRose to protect Lloyd and because he did not trust LaRose—so, if she snitched, her story would not match the facts. LaBrec then took Clark aside and whispered to him "what really happened." LaBrec told Clark that his "money fell through," but Clark still gave him some methamphetamine. Lloyd and LaBrec then drove to a random driveway in the country to get high and discuss what they were going to do.

¶9 LaBrec wanted to get rid of the guns and leave the state, but Lloyd did not. They decided to find someplace to lay low until morning, so LaBrec contacted Steve Kolpien. Kolpien met LaBrec and Lloyd at a truck stop in Cadott, then led them to a house where they left Lloyd's car and then drove them to Connie Sonnentag's residence. At Sonnentag's house, LaBrec asked Kolpien how to get rid of a gun, and Kolpien told LaBrec he could melt LaBrec's rifle down for him if LaBrec left the rifle with Kolpien, which he did. LaBrec subsequently told police he threw the rifle into the river because he wanted to protect Kolpien.

¶10 Finally, LaBrec testified about an incident that occurred one to three days before the shooting. LaBrec sold Patterson methamphetamine while LaBrec, Patterson, Lloyd and Kayla Naser were in Lloyd's car. During the transaction, Patterson made some threatening remarks to LaBrec. Patterson then exited the vehicle, "still talking shit." LaBrec "got mad," grabbed the .22 rifle he had with him, and pulled the trigger, trying to shoot Patterson in the back as Patterson walked away. The rifle did not fire, however, because there was no round in the chamber.

¶11 We turn next to the other evidence in the case relevant to this appeal. Patterson's dead body was found on the morning of March 14 in the yard of a home near the house that was under construction where LaBrec testified the attempted armed robbery and shooting had occurred. The Chippewa County coroner determined Patterson bled to death from a single gunshot to the femoral artery in his thigh. The medical examiner who performed the autopsy determined the wound was inflicted by a high-caliber bullet, larger than a .22.

¶12 Chippewa County Sheriff's Department Investigator Bradley Lau testified that he marked a blood trail leading from the body that connected to

another blood trail coming from the front of the house identified by LaBrec. Lau recovered three spent casings, one unfired round, and a fired bullet in a tree in the front lawn of the house. An additional spent casing was recovered from the backyard. The spent casings and unfired round were all marked "WIN .380 auto." Lau also recovered what he termed a "magazine tube pusher" for a .22 rifle alongside the house, during a walk-through of the crime scene with LaBrec.

¶13 Law enforcement obtained video surveillance of Scherer buying ammunition for the Cobra in Lloyd's company on March 11—two days before the shooting—as well as Lloyd and LaBrec's earlier attempt to buy ammunition. Scherer authenticated still images of himself and Lloyd from the video and confirmed that he bought the ammunition for Lloyd. A hardware store manager testified that, on March 11, he had assisted two men who bought a magazine for a .380 handgun that was returned later that day. The return paperwork was made under LaBrec's name.

¶14 Law enforcement executed a search warrant at the residence of Bruce Willi at the same time they arrested Lloyd there. Among other items, they recovered a .380 Cobra magazine clip, unfired ammunition marked "WIN .380 auto," consistent with that purchased by Scherer and recovered at the crime scene, and a smashed phone. Willi testified that he had never owned a Cobra, the items were not his, and LaBrec had not been in his residence since the shooting. No .380 ammunition was recovered in a search of the residence where LaBrec was arrested. Heidi Kunsman testified that she had owned a purple Cobra, which she discovered was missing after the shooting when police executed a search warrant at her residence.

¶15 Brandon Wooley told law enforcement that LaBrec had asked Lloyd to "help set up K.P." Wooley did not think that Lloyd "even wanted to do anything," but he was just doing what someone had told him to do. Wooley did not know much about the plan, other than it was "setting up, just rob him or something."

¶16 Gary LaRose testified that he hung out with Lloyd, LaBrec and Timmy Johnson at LaRose's house on the afternoon of March 13, getting high on methamphetamine. LaBrec showed LaRose a sawed-off rifle in pieces and asked if LaRose could fix it. Lloyd had a purple pistol, and he asked whether LaRose or Johnson knew anyone who wanted to buy it. Johnson similarly testified that LaBrec showed him and LaRose that he had a sawed-off .22 rifle with the stock broken off and that Lloyd showed them a purple pistol. Johnson said he asked Lloyd if he wanted to sell the purple pistol because his girlfriend might be interested in it. Johnson's then-girlfriend Heather Schroeder testified that she looked at the purple gun in Lloyd's possession, but she and Johnson decided not to buy it because Lloyd told them it was "hot."

¶17 Chelsea Steinke testified that she was with Lloyd and LaBrec at LaRose's house on the evening of March 13. Between 11:00 p.m. and midnight, Lloyd went outside to take a phone call, then came back in and told LaBrec they had to go. When Steinke asked where Lloyd and LaBrec were going, Lloyd responded that she did not want to know.

¶18 Johnathon Turner, with whom Patterson had been staying, testified that Patterson told him earlier in the day that he planned to go out with LaBrec and Lloyd that night. Turner had previously told police that Patterson said he was getting picked up by someone, but Turner did not know whom. Turner testified

that he did not immediately disclose that Patterson was going out with LaBrec and Lloyd because they were his friends.

¶19 Kolpien confirmed that he had met up with LaBrec and Lloyd at the Cadott gas station in the early morning hours of March 14. Law enforcement also obtained video surveillance of Lloyd and LaBrec at the gas station in Cadott. Kolpien testified that LaBrec and Lloyd told him they had gotten into an argument with someone who was hurt real bad, but they did not give him details. Kolpien said they had a discussion about how to get rid of a gun "if you ever had to get rid of one," and that Kolpien advised melting it down with a torch. Kolpien acknowledged that LaBrec left a "cooler" bag with him, but he maintained that he did not know it contained a rifle. Kolpien threw the bag in a dumpster in Boyd because LaBrec had asked him to get rid of it. Kolpien later led police to the dumpster, where they recovered the broken .22 rifle in the bag. Kolpien told police LaBrec stated he "pulled the trigger," but Kolpien testified at trial that he could not really recall who made the statement because he was high on methamphetamine at the time of the conversation.

¶20 Based on the above evidence, Lloyd requested an instruction on conspiracy to commit robbery by use of force as a lesser included offense of conspiracy to commit armed robbery. The circuit court denied the request. The court granted the State's request to instruct the jury on several lesser included offenses on the homicide charge, including homicide by negligent operation of a dangerous weapon. The jury convicted Lloyd on the charges of attempted armed robbery and possession of a firearm by a felon, but it acquitted him of all homicide-related charges.

## DISCUSSION

¶21    We independently review a circuit court's refusal to submit a jury instruction on a lesser included offense as a question of law. *State v. Barreau*, 2002 WI App 198, ¶17, 257 Wis. 2d 203, 651 N.W.2d 12. A lesser included offense is one that "does not require proof of any fact in addition to those which must be proved for the crime charged." WIS. STAT. § 939.66(1) (2019-20). Here, the parties agree that conspiracy to commit robbery by threat of force is a lesser included offense of conspiracy to commit armed robbery. Therefore, the only issue before us is whether the evidence presented at trial provided reasonable grounds both for acquittal on the greater charge and conviction on the lesser charge. *See Barreau*, 257 Wis. 2d 203, ¶17. In considering this question, we view the evidence in the light most favorable to the defendant. *Id.*

¶22    Lloyd argues that the evidence presented at trial would reasonably support the theory that Lloyd accompanied LaBrec to rob Patterson, but that Lloyd did not have a gun with him—having sold, traded, given or loaned the Cobra to LaBrec. Lloyd notes: (1) it was LaBrec, not Lloyd, who had a grudge against Patterson and had previously attempted to shoot him; (2) Wooley did not say that the plan Lloyd disclosed to him to rob Patterson involved a weapon; (3) the jury acquitted Lloyd of any homicide charges, including by negligent use of a firearm or as a natural and probable consequence of a conspiracy to commit armed robbery; (4) LaBrec had a motive to shift blame to Lloyd; and (5) LaBrec was trying to buy an operable gun while Lloyd was trying to sell the Cobra just hours before the shooting.

¶23    None of these points reasonably supports the conclusion that Lloyd and LaBrec conspired to commit a robbery by threat or use of force, rather than by

threat or use of a dangerous weapon, given the other evidence at trial. Lloyd was seen in possession of the presumed murder weapon, the Cobra, just hours before the shooting. Lloyd was involved in buying ammunition for the Cobra only two days before the shooting. After the shooting, ammunition for the Cobra was discovered in the residence where Lloyd was staying, not where LaBrec was staying. Also after the shooting, LaBrec arranged for the disposal of the .22 rifle, but not of the Cobra. The fact that the jury acquitted Lloyd of any homicide charge does not compel the conclusion that it believed LaBrec was in possession of the Cobra and shot Patterson. Rather, the jury could have believed LaBrec's testimony that the Cobra discharged accidentally, and concluded that it was not reasonably foreseeable that it would discharge.

¶24 In sum, there was no evidence whatsoever that Lloyd transferred the Cobra to LaBrec before the shooting. The only reasonable conclusion to draw from the evidence that Lloyd brought a weapon with him to the attempted robbery and that Patterson was shot with that weapon is that Lloyd was, in fact, using the weapon during the attempted robbery. Therefore, the circuit court properly refused to instruct the jury on the lesser included offense of conspiracy to commit robbery by threat or use of force.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2019-20).