State of Wisconsin, Plaintiff-Respondent,

v.

Paul J. Stuart, Defendant-Appellant-Petitioner.

Supreme Court

*No. 2001AP1345–CR. Oral argument December 6, 2004.—Decided April 21, 2005.*

2005 WI 47

(Also reported in 695 N.W.2d 259.)

For the defendant-appellant-petitioner there were briefs by *Christopher W. Rose* and *Rose & Rose,* Kenosha, and oral argument by *Christopher W. Rose.*

For the plaintiff-respondent the cause was argued by *Jeffrey J. Kassel,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

An amicus curiae brief was filed by *Michele A. Tjader* and *Tjader & Chirafisi, LLC,* Madison, on behalf of the Wisconsin Association of Criminal Defense Lawyers.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, Paul Stuart, seeks review of an unpublished decision of the court of appeals affirming a judgment of conviction and order denying postconviction relief.[1] Stuart was convicted in 1999 of first-degree intentional homicide for the shooting death of Gary Reagles. This is the third time that Stuart's case has come before this court.

¶ 2. Stuart now asks us to reexamine our decision in *State v. Stuart,* 2003 WI 73, 262 Wis. 2d 620, 664 N.W.2d 82. There, we rejected his claim that the preliminary hearing testimony of his brother, who implicated Stuart in the murder, was improperly admitted at trial after the brother refused to testify on Fifth Amendment grounds. Stuart asserts that the use of such testimony violated his right to confrontation, as guaranteed by the Sixth Amendment and Article I, Section 7 of the Wisconsin Constitution.

---

[1] *State v. Stuart,* No. 01–1345, unpublished slip. op. (Wis. Ct. App. December 10, 2003) (affirming a judgment and order of the circuit court for Kenosha County, Michael S. Fisher, Judge).

¶ 3. In light of *Crawford v. Washington,* 541 U.S. 36 (2004), we agree with Stuart that the testimony in question should not have been admitted in his case.[2] Such evidence violated Stuart's right to confrontation, as he did not have the opportunity to question his brother about a potential motive to testify falsely. We also conclude that the error was not harmless. Accordingly, we reverse the decision of the court of appeals and remand for a new trial.

I

¶ 4. On March 27, 1990, Gary Reagles was found dead in his apartment with a single gunshot wound to the chest. A Berretta nine-millimeter gun lay on the floor near his body. Reagles had a history of emotional problems, including prior suicide attempts. His girlfriend told police that he had been threatening suicide because of their impending breakup. Reagles used cocaine on the night of his death and had a blood alcohol content of .393%. Initially, his death was ruled a suicide.

¶ 5. In 1998, Stuart was charged with the first-degree intentional homicide of Reagles. At the prelimi-

[2] Under the law of the case doctrine, " 'a decision on a legal issue by an appellate court establishes the law of the case, which must be followed in all subsequent proceedings in the trial court or on later appeal.' " *State v. Stuart,* 2003 WI 73, ¶ 23, 262 Wis. 2d 620, 664 N.W.2d 82 (quoting *Univest Corp. v. General Split Corp.,* 148 Wis. 2d 29, 38, 435 N.W.2d 234 (1989)). This rule, however, is not absolute. *Id.,* ¶ 24. An appellate court may disregard the doctrine in the interest of justice or in certain circumstances when " 'cogent, substantial, and proper reasons exist.' " *Id.,* ¶ 24 (quoting *Univest,* 148 Wis. 2d at 39). Because *Crawford v. Washington,* 541 U.S. 36 (2004) represents a change in controlling authority, the State acknowledges that the law of the case doctrine does not preclude us from revisiting Stuart's Confrontation Clause claim. We agree.

nary hearing, his brother John Stuart (hereinafter John) implicated him in the shooting.

¶ 6. John testified that on the morning Reagles's body was found, Stuart spoke with him at his residence. Stuart indicated that during the night he partied with Reagles, drinking and getting high on cocaine. According to John, Stuart confessed to shooting Reagles because of cocaine and because Reagles was going to say something about a recent burglary perpetrated by the two brothers.

¶ 7. As questioning continued, John admitted that he and Stuart burglarized a home in Illinois a short time before Reagles's death. They stole coins, pocketknives, and some guns. One of the guns stolen was a Berretta nine-millimeter. John indicated that Stuart had possession of that weapon following the burglary. He described Stuart to be "very confused, very distraught" and "scared" when talking about the shooting. Stuart told him that after he shot Reagles, he "fixed it to look like a suicide."

¶ 8. John testified that George Stuart (hereinafter George), another brother, came over later that day and told John and Stuart that Reagles had been found dead in his apartment. According to John, Stuart acted surprised when informed about the shooting, as if he knew nothing about it. Later, Stuart asked John to provide him with an alibi. Specifically, he asked John to say that he had been at John's home at the time of the shooting. John testified that Stuart left the state on a trip to Arizona within a week of Reagles's death.

¶ 9. On cross-examination, John acknowledged that Stuart's trip to Arizona was not unusual because their mother lived there. He said that he first told police about the information he had regarding Reagles's death when he was stopped for a routine traffic offense in

1992 or 1993.[3] He indicated that he gave another statement to police in June of 1998. Defense counsel then asked about the circumstances under which John gave this statement, which drew an objection from the State. The exchange regarding that June 1998 statement was as follows:

Q: Did you have occasion to give that [information you testified to today] to Detective Tappa in June of this year?

A: Did I?

Q: Yes.

A: Yes.

Q: And under what circumstances did you do that?

[Prosecutor]: Objection. Irrelevant.

[Defense Counsel]: It's very relevant under what circumstances the statements that he has testified to as they relate to the criminal complaint in the statement in June 1, 1998.

[Prosecutor]: It's discovery. Your Honor, it pertains to credibility, but not to plausibility.

Court: I think it goes to the credibility issue certainly, and it certainly is discovery. So the objection is sustained.

¶ 10. After the objection, defense counsel continued his cross-examination. John admitted that he was "stoned" when Stuart told him about the shooting. He

---

[3] Detective Tappa testified at trial that he stopped John's vehicle in 1992 because he thought John was his brother Larry, for whom there was an outstanding warrant.

665

testified to smoking five or six additional marijuana cigarettes after his conversation with Stuart. John stated that he was confused during the conversation and did not believe what Stuart told him. He was also confused when George came over with the news of Reagles's death because Stuart acted like he had no prior knowledge of it.

¶ 11. Finally, John acknowledged telling police that Stuart told him that there were two shots fired. He further admitted lying for Stuart when he told officers that Stuart was at his home the day of the shooting. After hearing testimony from John and another witness, Arthur Parramoure, who testified that Stuart confessed to shooting Reagles, the court bound the defendant over for trial.[4]

¶ 12. On February 8, 1999, the trial began. On the third day of the trial, John took the witness stand and asserted his Fifth Amendment right against self-incrimination. He refused to answer questions, and persisted in the refusal despite the State's offer of use immunity for his testimony and the circuit court's warning that he could be held in contempt of court. According to his attorney, John believed that he had a plea bargain in exchange for his cooperation with the police, and that the State did not keep its part of the

---

[4] Arthur Parramoure, whose ex-wife is Stuart's niece, testified that he and Stuart drove to Arizona a few days after the death of Reagles. He stated that while they were driving through Oklahoma, Stuart said that he shot Reagles during an argument over a gun. According to Parramoure, Stuart told him the next day that he was "bullshitting" him about killing Reagles. When Stuart testified in his own defense at trial, he explained that he was trying to scare Parramoure so that Parramoure would not mistreat Stuart's niece.

bargain. Accordingly, although the plea bargain called upon him to testify at trial in Stuart's case, he nevertheless refused to do so.[5]

¶ 13. The circuit court held John in contempt of court. The State then moved to have John's preliminary hearing testimony admitted into evidence. Stuart's attorney objected, claiming that there was no effective cross-examination of John allowed at the preliminary hearing.

¶ 14. On February 11, 1999, after a motion hearing, the circuit court ruled that John's preliminary hearing testimony was inadmissible. The State immediately appealed. By order dated February 16, 1999, the court of appeals summarily affirmed the circuit court's

---

[5] At Stuart's trial, John indicated through his attorney that he "believe[d] there was a plea bargain that was supposedly made with regard to his pleading to certain charges that also involved him testifying in this case. It was his opinion or belief that that plea bargain was not honored at the time of sentencing." The prosecutor denied that the charges against John had been reduced on June 2, 1998, as a result of Stuart's case. In doing so, however, she admitted, "I can tell you when I spoke to [John] he told me he was shafted by me personally because I was the prosecutor on his case. He stated his belief was that I was to come into court and recommend probation . . . ."

John's understanding of the existence of a deal is buttressed by a letter dated May 12, 1998 from the Kenosha County District Attorney, indicating that it would not pursue charges against him for truthful information he provided regarding Reagles's death. It is also supported by a report by Detective Tappa dated June 1, 1998, acknowledging that arrangements were also made with the Illinois State's Attorney, granting John immunity from a burglary he committed before Reagles's death. The Illinois burglary charge was not pursued. Ultimately, we need not resolve what, if any, agreement existed between the parties.

ruling, determining that the opportunity to cross-examine at the preliminary hearing was insufficient to satisfy the constitutional right to confrontation.

¶ 15. The State subsequently filed an emergency petition for review. This court ordered the trial stayed, pending its decision. Thus, in the middle of the trial, everything in the case stopped to await an answer from this court on the issue of the admissibility of John's preliminary hearing testimony. The parties submitted briefs and this court held oral argument on February 23, 1999. The same day, following oral argument, we issued an order reversing the decision of the court of appeals.

¶ 16. After this court's ruling, the trial resumed. Based on our reversal of the court of appeals' decision, the circuit court had John's preliminary hearing testimony read into the record. Defense counsel moved the court "to take judicial notice" that there were two open Kenosha County felony cases against John at the time he was cooperating with the prosecution in its investigation of Stuart. The court refused this request, stating that "[t]he jury will be informed that John had four prior convictions, and that will be the end of what we know about John Stuart."

¶ 17. Additional witnesses were called at trial regarding purported confessions by Stuart. Michael Schultz testified that in March of 1990, he met Stuart in a bar and Stuart told him that he had to kill Reagles. Likewise, David Small testified that when he shared a jail cell with Stuart in September of 1998, Stuart told him details of the shooting. Benjamin Woody also testified that Stuart admitted killing Reagles in a conversation on October 5, 1998. Finally, Damian Simpson was present during Stuart's statements to Woody and stated that Stuart admitted killing Reagles.

¶ 18. On February 26, 1999, Stuart was found guilty of first-degree intentional homicide. He filed a motion for postconviction relief, which was denied. Stuart appealed, and the court of appeals certified the case to this court, identifying two specific issues:

When an appellate court issues an opinion resolving a discretionary ruling of the circuit court, is its decision the law-of-the-case?

Whether an unpublished Wisconsin Supreme Court order reversing a decision of the court of appeals, without providing legal reasoning or legal authorities, establishes the law-of-the-case?

¶ 19. This court held that its 1999 decision established the law of the case with regard to the Confrontation Clause issue. *See Stuart,* 262 Wis. 2d 620, ¶ 43. It also determined that there were no extraordinary circumstances present that would justify a departure from the law of the case doctrine because the testimony was properly admitted under Confrontation Clause precedent. *See id.,* ¶¶ 32–41. However, this court did not decide the other issues raised by Stuart and remanded those for consideration by the court of appeals. *Id.,* ¶ 4.[6]

---

[6] Those questions included:

1) Whether trial counsel was ineffective where he failed to stipulate to a pending subornation of perjury charge by John Stuart?

2) Whether the trial court erred for failing to inform the jury concerning the significant criminal charges John Stuart was facing at the time he gave a statement?

3) Whether the trial court erred when it barred the defendant from arguing John Stuart's bias?

4) Whether or not new evidence warrants a new trial?

¶ 20. On remand, the court of appeals rejected all of Stuart's other claims and affirmed the judgment of conviction and order denying postconviction relief. Stuart then filed a petition for review in which he asked this court, among other things, to reexamine its 2003 decision.

¶ 21. While that petition was pending, the United States Supreme Court issued its decision in *Crawford*, 541 U.S. 36, which altered Confrontation Clause jurisprudence. When granting Stuart's petition, this court limited its review to the impact *Crawford* had on his case.

## II

¶ 22. The central question we address in this case is an evidentiary one. It concerns the admissibility of John's preliminary hearing testimony at Stuart's trial. Whether the admission of this evidence violated Stuart's constitutional right to confrontation is a question of law subject to independent appellate review. *State v. Williams*, 2002 WI 58, ¶ 7, 253 Wis. 2d 99, 644 N.W.2d 919 (citing *State v. Ballos*, 230 Wis. 2d 495, 504, 602 N.W.2d 117 (Ct. App. 1999)).

---

5) Whether the failure of defense counsel to inform the jury that Arthur Parramoure had a criminal conviction would entitle defendant to a new trial?

6) Whether trial counsel was ineffective for failing to object to evidence of the nature of Paul Stuart's criminal convictions?

7) Whether Paul Stuart's conviction should be reversed in the interest of justice?

*Stuart*, 262 Wis. 2d 620, ¶ 4, n. 2.

¶ 23. We begin by examining the issue of Stuart's constitutional right to confrontation. The relevant principles and precedent guiding our analysis were recently set forth in *State v. Hale,* 2005 WI 7, ¶¶ 43–58, 277 Wis. 2d 593, 691 N.W.2d 637. Although we do not replicate that discussion in full, we highlight some of it here.

¶ 24. At the time of Stuart's trial and first appeal, the reliability analysis of *Ohio v. Roberts,* 448 U.S. 56 (1980), provided the general framework for determining the admissibility of out-of-court statements under the Confrontation Clause. This court adopted the *Roberts* approach in *State v. Bauer,* 109 Wis. 2d 204, 325 N.W.2d 857 (1982), when it held that the admission of an unavailable witness's preliminary examination did not violate the defendant's right to confrontation. *See Bauer,* 109 Wis. 2d at 208–22.

¶ 25. Applying the *Roberts/Bauer* framework in our previous decision, we concluded that the admission of John's preliminary hearing testimony did not violate Stuart's right to confrontation. *See Stuart,* 262 Wis. 2d 620, ¶¶ 32–41. In doing so, we reasoned that, "John's testimony at the preliminary hearing and the circumstances surrounding it were sufficient to satisfy the requirement that there be indicia of reliability." *Id.,* ¶ 41.

¶ 26. As noted in *Hale,* 277 Wis. 2d 593, ¶ 52, "[w]ith the *Crawford* decision, a new day has dawned for Confrontation Clause jurisprudence." Thus, the reliability analysis of *Roberts/Bauer* is no longer good law with respect to the admission of testimonial hearsay evidence. Under *Crawford,* where testimonial hearsay evidence is at issue, the Sixth Amendment demands

what the common law required: (1) unavailability and (2) a prior opportunity for cross-examination.[7] 541 U.S. at 68.

¶ 27. Like the defendant in *Hale,* Stuart is the beneficiary of this change in the law because he properly preserved the confrontation issue and his case is still on direct appeal. *State v. Koch,* 175 Wis. 2d 684, 694, 499 N.W.2d 152 (1993) (citing *Griffith v. Kentucky,* 479 U.S. 314, 328 (1987)). Accordingly, we consider the applicability of *Crawford* to his case.

¶ 28. The threshold question for applying the *Crawford* framework is whether the State is proffering "testimonial" hearsay evidence. Although the *Crawford* Court declined to provide a comprehensive definition of what constitutes testimonial evidence, it noted that "it applies at a minimum to prior testimony at a preliminary hearing . . . ." *Crawford,* 541 U.S. at 68. Thus, there is no dispute that John's testimony at the preliminary hearing constituted testimonial hearsay evidence.

¶ 29. Because John's hearsay evidence was testimonial, we turn next to the requirements of the Confrontation Clause as interpreted by *Crawford:* (1) unavailability of the declarant and (2) a prior opportunity for cross-examination. *Id.* In this case, there is no dispute that John was unavailable. Both parties also agree that Stuart's limited cross-examination of his brother at the preliminary hearing was insufficient to satisfy his right to confrontation. We too concur with this conclusion.

---

[7] Cross-examination has been described as the " 'greatest legal engine ever invented for the discovery of truth.' " *California v. Green,* 399 U.S. 149, 158 (1970) (quoting 5 Wigmore § 1367).

¶ 30. In Wisconsin, a defendant has a statutory right at a preliminary hearing to cross-examine witnesses against him. Wis. Stat. § 970.03(5).[8] However, the scope of that cross-examination is limited to issues of plausibility, not credibility. *State ex rel. Huser v. Rasmussen,* 84 Wis. 2d 600, 614, 267 N.W.2d 285 (1978). This is because the preliminary hearing "is intended to be a summary proceeding to determine essential or basic facts" relating to probable cause, not a "full evidentiary trial on the issue of guilt beyond a reasonable doubt." *State v. Dunn,* 121 Wis. 2d 389, 396–97, 359 N.W.2d 151 (1984).

¶ 31. Cross-examination at a preliminary examination is not to be used "for the purpose of exploring the general trustworthiness of the witness." *Huser,* 84 Wis. 2d at 614. Indeed, "[t]hat kind of attack is off limits in a preliminary hearing setting." *State v. Sturgeon,* 231 Wis. 2d 487, 499, 605 N.W.2d 589 (Ct. App. 1999). When this restriction is enforced, as it was in the present case, and the State attempts to use the preliminary hearing testimony at a later trial, a Confrontation Clause problem arises.

¶ 32. In *Delaware v. Van Arsdall,* 475 U.S. 673 (1986), the Supreme Court held that a defendant's right to confrontation was violated when he was prohibited from cross-examining a prosecution witness about possible motive to testify falsely as a result of the State's dismissal of a pending charge against him. The Court explained that " 'the exposure of a witness' motivation in testifying is a proper and important function of the

---

[8] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

constitutionally protected right of cross-examination.' "
*Id.* at 678–79 (quoting *Davis v. Alaska,* 415 U.S. 308, 316–17 (1974)).

¶ 33. Likewise, in *State v. Lenarchick,* 74 Wis. 2d 425, 448, 247 N.W.2d 80 (1976), this court observed that a "defendant, as an ingredient of meaningful cross-examination, must have the right to explore the subjective motives for the witness' testimony." There, defense counsel was not permitted to cross-examine a witness about a charge against that witness that had been dismissed while the defendant's case was pending. *Id.* at 446. Although no promises had been made to the witness, this court nevertheless recognized the potential motivation to testify falsely:

> [The witness] may well have been testifying favorably to the state in the hope and expectation that the state would reward him by dropping or reducing pending charges. Even though that expectation were absurd, defense counsel had the right and duty to explore the witness' motives. When a witness has been criminally charged by the state, he is subject to the coercive power of the state and can also be the object of its leniency. The witness is aware of that fact, and it may well influence his testimony.

*Id.* at 447–48.

¶ 34. In this case, the jury was informed by the court that John had four criminal convictions. Furthermore, it learned from John's direct examination at the preliminary hearing that he committed a burglary a short time before Reagles's death and that he lied to police. Defense counsel also obtained admissions from John that he was "stoned" and "confused" when he spoke with Stuart about the killing and believed Stuart told him that there were two shots fired.

¶ 35. However, Stuart did not have the opportunity at the preliminary hearing to question his brother about a potential motive to testify falsely. Thus, he was unable to elicit evidence that John had been facing criminal charges in 1998 when he gave his statement to police implicating Stuart in the death of Reagles.[9]

¶ 36. Admittedly, the record is unclear as to what, if any, deal was reached between John and the Kenosha County District Attorney. The facts indicate that while stopped for a traffic matter in 1992, John gave a statement implicating Stuart in a homicide. He agreed to cooperate with authorities and gave another statement in jail on June 1, 1998, one day before he was to appear in Kenosha County Circuit Court to enter pleas in a case where he faced 52 years in prison. The State filed an amended information in that case the next day, June 2, 1998, reducing his exposure by 40 years, from 52 to 12. Additionally, charges relating to an Illinois burglary were not pursued. All of these actions took place prior to John's testimony at Stuart's preliminary hearing on August 13, 1998.

¶ 37. At the very least, these facts demonstrate a potential motivation to testify falsely on the part of John. Had John testified at trial and Stuart been precluded from exploring the motivation to testify falsely, such a restriction would be considered a Confrontation Clause violation. *See, e.g., Van Arsdall,* 475 U.S. at 679; *see also State v. Barreau,* 2002 WI App 198, ¶ 55, 257 Wis. 2d 203, 651 N.W.2d 12.

---

[9] Although defense counsel tried to ameliorate this problem through the use of judicial notice, his attempt proved unsuccessful.

¶ 38. As a result, like the State, we agree with Stuart that the use of his brother's preliminary hearing testimony at trial violated his right to confrontation. The circuit court properly did not allow Stuart to cross-examine John at the preliminary hearing about the effect the pending charges had on his decision to cooperate. Accordingly, John's preliminary hearing testimony should not have been admitted at trial.

IV

¶ 39. Having determined that Stuart's right to confrontation was violated, we examine next whether the error warrants a new trial. Violation of the Confrontation Clause does not result in automatic reversal, but rather is subject to harmless error analysis. *State v. Weed,* 2003 WI 85, ¶ 28, 263 Wis. 2d 434, 666 N.W.2d 485 (quoting *State v. Williams,* 2002 WI 118, 2, 256 Wis. 2d 56, 652 N.W.2d 391).

¶ 40. The test for this harmless error was set forth by the Supreme Court in *Chapman v. California,* 386 U.S. 18 (1967), *reh'g denied,* 386 U.S. 987 (1967). There, the Court explained that, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24. An error is harmless if the beneficiary of the error proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*[10] Here, the State must carry the burden of proof.

---

[10] In recent years, the U.S. Supreme Court and this court, while adhering to the *Chapman* test, have also articulated alternative wording. *See, e.g., Neder v. United States,* 527 U.S. 1,

¶ 41. As noted in *Hale,* 277 Wis. 2d 593, ¶ 61, this court has articulated several factors to aid in its harmless error analysis. These include the frequency of the error, the importance of the erroneously admitted evidence, the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence, whether the erroneously admitted evidence duplicates untainted evidence, the nature of the defense, the nature of the State's case, and the overall strength of the State's case. *Id.* (citing *State v. Norman,* 2003 WI 72, ¶ 48, 262 Wis. 2d 506, 664 N.W.2d 97; *State v. Billings,* 110 Wis. 2d 661, 668–70, 329 N.W.2d 192 (1983)).[11]

¶ 42. In this case, the State contends that Stuart is not entitled to a new trial because the error in admitting John's preliminary hearing testimony was harmless. The State's reasoning is twofold. First, it submits that Stuart would not have been able to effectively impeach John with the circumstances surrounding the 1998 convictions because John testified that he had given the same information to the police in 1992 when no charges were pending. Second, it notes that there were five witnesses other than John who testified that Stuart admitted shooting Reagles.

2–3 (1999); *State v. Weed,* 2003 WI 85, ¶ 29, 263 Wis. 2d 434, 666 N.W.2d 485; *State v. Harvey,* 2002 WI 93, ¶ 48, n. 14, 254 Wis. 2d 442, 647 N.W.2d 189.

[11] This multifactor approach has been utilized by other jurisdictions in recent cases involving Confrontation Clause violations. *E.g., State v. Cox,* 876 So. 2d 932, 939 (3rd Cir. 2004); *Richardson v. Newland,* 342 F. Supp. 2d 900, 925, n. 15 (E.D. Cal. 2004); *People v. Fry,* 92 P.3d 970, 980 (Colo. 2004); *Jones v. U.S.,* 853 A.2d 146, 153–54 (D.C. 2004); *Hannon v. State,* 84 P.3d 320, 332–33 (Wyo. 2004). *See also United States v. Gilbert,* 391 F.3d 882 (7th Cir. 2004).

¶ 43. We are not persuaded by the State's argument. To begin, John never testified that the information was the same. Rather, when asked whether it was "pretty much the same," he responded in the affirmative. The record is unclear as to the substance of John's 1992 conversation with police. It was not testified to at trial, and no police report memorializing the contact was ever entered into evidence. Thus, it is impossible to know if the information given in 1992 was "the same" as that given in 1998.

¶ 44. We do know, however, that prosecution was not commenced against Stuart until after John's second conversation with authorities in 1998. It is reasonable to assume that John's first statement to police did not provide enough information to charge Stuart. The second statement apparently differed sufficiently to enable the commencement of the prosecution. Contrary to the State's assertion, such a circumstance provides fodder for cross-examination and effective impeachment.

¶ 45. Next, the State contends that the error was harmless because five witnesses, other than John, testified that Stuart admitted shooting Reagles. At first blush this appears to be a strong, if not a conclusive, argument. However, the record reveals that the witnesses' testimony had some weaknesses. To begin, of the five witnesses who testified that Stuart admitted shooting Reagles, four acknowledged having criminal records. The fifth witness, Arthur Parramoure, also had a criminal record, but the jury was not informed of this fact.

¶ 46. Of the four witnesses, the number of convictions between them totaled 37.[12] The law presumes that

---

[12] David Small had 12 convictions, Michael Schultz had 11 convictions, Benjamin Woody had 7 convictions, and Damian Simpson had 7 convictions.

the number of criminal convictions is relevant to a witness's credibility. *State v. Smith,* 203 Wis. 2d 288, 297–98, 533 N.W.2d 824 (Ct. App. 1996). "The assumption is that the longer the criminal record, the less credible the individual." *Id.* at 297 (citing Daniel D. Blinka, Wisconsin Evidence § 609.1 at 311 (West's Wisconsin Practice Series, Vol. 7, 1991)).

¶ 47. In addition to hearing their criminal records, the jury heard the testimony of the witnesses contradicted or challenged by witnesses for the defense. Both Benjamin Woody and Damian Simpson testified that on October 5, 1998, while incarcerated in the Kenosha County Jail, they heard Stuart admit to killing Reagles. Yet witnesses for the defense, Miroslav Romanic and William McCracken, were present during Stuart's alleged confession to Benjamin Woody and Damian Simpson and denied that it ever took place.

¶ 48. Michael Schultz testified that he met Stuart in a bar in Kenosha and that Stuart admitted to killing Reagles. Yet, the testimony of defense witnesses Robert Landerman III and Scott Finely was offered to attack Schultz's credibility. They testified that they overheard Schultz, who previously testified for the State, tell Stuart that he had never signed statements implicating Stuart in Reagles's death.

¶ 49. David Small, a former cellmate of Stuart, testified that Stuart admitted to killing Reagles. His testimony was contradicted by the testimony of the defendant. Furthermore, Small's credibility could be undermined because he had 12 prior convictions, the most of any of the State's witnesses.

¶ 50. Admittedly, the fifth witness, Arthur Parramoure, testified truthfully when he stated that Stuart admitted to killing Reagles. Stuart acknowledged telling Parramoure that and then subsequently telling

him that it was not true. According to Stuart, he told Parramoure of the murder in order to frighten Parramoure. He wanted Parramoure to be afraid of him, hoping that the fear would keep Parramoure from mistreating Stuart's niece, who was Parramoure's ex-wife. Given these discrepancies and explanation, the impact of the several witnesses' testimony is diminished, while the effect of the uncontroverted erroneously admitted evidence is enhanced.

¶ 51. In analyzing whether the error was harmless, this court considers several factors, including the importance of the erroneously admitted evidence. Here, the importance of John's preliminary hearing testimony is reflected in the action and words of the prosecutor. The action, of course, was the emergency petition filed with this court in the middle of trial, which dealt exclusively with the admission of John's preliminary hearing testimony. The words, meanwhile, were the nearly dozen references made to John's testimony during opening, closing, and rebuttal. Specifically, the prosecutor told the jury that the "most important evidence all came in through John Stuart's testimony and Art Parramoure's testimony."

¶ 52. Apparently, both the jury and judge agreed with the prosecutor's assessment of the evidence. A day into deliberations, the jury asked that the testimony of two witnesses, John and Arthur Parramoure, be read to it. The request was denied with the admonition that the jury should use its collective memories. Later in the morning, the jury again asked for the testimony. This time, it was read back to them. The exchange between the judge and foreman was as follows:

> Court: All right. You have indicated in your note you have exhausted your collective and personal memories. There are still some issues you can't resolve.

[Foreperson]: Yes.

Court: We are prepared to read back to you the testimony that was given in court by Mr. Parramoure and John Stuart through both himself and the transcript of some testimony he had given at a preliminary hearing.

The Court reporter will read that back to you.

(Record read)

Court: Ladies and Gentlemen, I would advise you that the transcript that was read to you of the preliminary hearing was conducted on August 13, 1998. That is the testimony that you have asked for that we have read back to you.

Lunch has been ordered. You may go back to the jury room now and continue your deliberations.

¶ 53. Immediately after lunch, at 1:05 p.m., the jury returned a verdict of guilty. Later at postconviction, the judge who presided at trial remarked, "I don't think this was a close case after they read [John's] statement into the record."

¶ 54. The court also considers the overall strength of the State's case. Without the admission of John's preliminary hearing testimony, the overall strength of the State's case would have diminished appreciably. In part, this is because of the nature of the State's case. Here, there was no physical evidence, no DNA or fingerprints, linking Stuart to the shooting. There were no eyewitnesses. As a result, the State relied on circumstantial evidence to prove its case.

¶ 55. We also consider whether there was untainted evidence that corroborates or duplicates the erroneously admitted evidence. Although the testimony

of the several witnesses corroborates John's statement, it can hardly be described as untainted for the reasons listed above. Nevertheless, we acknowledge that the cumulative effect benefits the State's case.

¶ 56. Finally, we examine the nature of the defense in assessing whether the error was harmless. Here, the theory of Stuart's defense was that Reagles had committed suicide. This was certainly plausible given Reagles's prior suicide attempts, his more immediate threatened suicide due to an impending breakup with his girlfriend, and the presence of cocaine and alcohol in his bloodstream. Indeed, Reagles's death was initially ruled a suicide.

¶ 57. In considering these facts and factors, we are impelled to the conclusion that the error in admitting the preliminary hearing testimony, in violation of the defendant's right to confrontation, was not harmless. The State has the burden of proving beyond a reasonable doubt that "the error complained of did not contribute to the verdict obtained." *Chapman,* 386 U.S. at 24. The State failed to meet that burden here. The action and words of the prosecutors, judge, and jury underscore the importance of the erroneously admitted evidence. We are unable to conclude that this evidence did not contribute to the verdict.

V

¶ 58. In sum, in light of *Crawford,* 541 U.S. 36, we agree with Stuart that the testimony in question should not have been admitted in his case. Such evidence violated Stuart's right to confrontation, as he did not have the opportunity to question his brother about a potential motive to testify falsely. We also conclude that

682

the error was not harmless. Accordingly, we reverse the decision of the court of appeals and remand for a new trial.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded.

¶ 59. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I join Justice Ann Walsh Bradley's opinion. For my discussion of *Chapman, Neder,* and harmless error, see my concurrence in *State v. Hale,* 2005 WI 7, 277 Wis. 2d 593, 691 N.W.2d 637.

¶ 60. DAVID T. PROSSER, J. (*concurring*). With great reluctance, I concur in the decision to reverse the defendant's conviction and remand for a new trial. I agree with the conclusion that the admission of John Stuart's preliminary examination testimony violated the defendant's right to confrontation under *Crawford v. Washington,* 541 U.S. 36 (2004), and that admission of this testimony did not constitute harmless error. Under the circumstances of this case, the defendant did not have an adequate opportunity to challenge the credibility of the witness's testimony. This does not mean that John Stuart's testimony would not have been admissible under different circumstances; nor does it mean that I am backing away from the court's articulation of the harmless error rule in *State v. Harvey,* 2002 WI 93, 254 Wis. 2d 442, 647 N.W.2d 189. I write separately to reiterate that under *Crawford,* confrontation requirements may be relaxed in situations where a defendant forfeits the right to cross-examination by wrongdoing or collusion.

I

¶ 61. The lead opinion correctly notes that this is the third time this case has come to our court. Lead op.,

¶ 1. The first time was on February 23, 1999. After an emergency hearing in the midst of Paul Stuart's trial, a majority of this court voted to reverse the court of appeals, which had affirmed the circuit court's decision to exclude the preliminary hearing testimony of John Stuart.

¶ 62. John Stuart had testified at a preliminary examination on August 13, 1998. He had been cross-examined by his brother's attorney, though not extensively. At trial, however, he made himself "unavailable" by asserting the privilege against self-incrimination.

¶ 63. Called to testify on February 10, 1999, John asked for a brief delay so that he could consult with his attorney. Upon his return, the following colloquy occurred:

| | |
|---|---|
| The Court: | Are you intending to plead the Fifth in regard to all questions asked of you? |
| Mr. Stuart: | Yes, sir. I've been advised to plead the Fifth. |
| The Court: | Okay. I'm not sure what the State intends to do here. |
| Ms. Karaskiewicz: | The State would give him use immunity. |
| The Court: | The State is willing to offer you use immunity, which means whatever you say cannot be used against you to prosecute you in regard to those matters. |

¶ 64. John Stuart continued to refuse to testify. This prompted Assistant District Attorney Susan Karaskiewicz to explain that "when I spoke to Mr.

Stuart he told me he was shafted by me personally because I was the prosecutor on his case." She pointedly denied this claim.

¶ 65. Paul Stuart's attorney then inquired about "transactional immunity" for John, so that if he testified in a manner different from his testimony at the preliminary examination, he could not be prosecuted for perjury. The State refused that request.

¶ 66. District Attorney Robert Jambois reasoned that the court could not give the defendant a license to commit perjury. He added: "The witness [John Stuart] has given statements that he fears his brother, that he believes his brother is a homicidal maniac and dangerous." A few moments later, in open court, John asserted the Fifth Amendment privilege against self-incrimination before the jury.

¶ 67. The following morning, February 11, the court addressed John Stuart again. Still he refused to testify. District Attorney Jambois was permitted to ask the witness whether he had met with a person named Art Herbst, and John admitted that he had. This produced an explosive exchange among John's attorney (Douglas Henderson), Paul's attorney (Robert Bramscher), and the district attorney.

| | |
|---|---|
| Mr. Bramscher: | Perhaps Mr. Jambois should make an offer of proof why he wants that question answered and why it is relevant. |
| | . . . . |
| Mr. Jambois: | . . . I will indicate the relevance of this line of inquiry. It is the State's view, your Honor, that this witness's assertion of his Fifth Amendment right is a |

ruse. . . . He's involved in a conspiracy involving Mr. Art Herbst and involving Mr. Henderson and Mr. Bramscher. He does not want to testify in a manner that incriminates his brother or having his brother convicted of first degree intentional homicide. He met with Mr. Herbst a number of hours on Saturday and last night.

Mr. Bramscher: It was Sunday. Perhaps you want to get your facts correct.

Mr. Jambois: Sunday. He met with Mr. Art Herbst last night [Wednesday]. I believe Mr. Bramscher would not have <u>his representative</u> meet with a represented witness without getting the authorization from Mr. Henderson to meet with him. The fact such a meeting took place further indicates this witness is not in good faith asserting the Fifth Amendment right.

. . . .

Mr. Jambois: . . . I believe Mr. Henderson and Mr. Bramscher are working together in keeping this witness off the stand. The witness is not legitimately pursuing the Fifth Amendment privilege. He does not want to testify against his brother.

. . . .

Mr. Jambois: I think, your Honor, in deciding about . . . the admission of his preliminary hearing testimony . . . as a practical matter the Court would be

686

interested in knowing whether this witness's unavailability was strongly encouraged by the defense. . . . If that is a factor that influences his unavailability, it would seem that would be a factor the Court would consider in deciding whether . . . to admit his preliminary hearing testimony. (Emphasis added.)

¶ 68. At this point, Attorney Bramscher acknowledged meeting with John Stuart but he asserted that the witness wanted to change his testimony.

¶ 69. In the end, John would not testify. As a result, he was held in contempt. After the court denied the State's motion to admit John's preliminary examination testimony, the State filed an emergency appeal. The court of appeals affirmed the circuit court. On February 23, a majority of this court reversed after learning that John's testimony at the preliminary hearing was subject to some cross-examination, was consistent with a prior statement he made to police, and was also consistent with the testimony of several other witnesses.

¶ 70. When the trial resumed, the circuit court admitted John Stuart's testimony. Unable to cross-examine the witness, the defendant's attorney sought to discredit his testimony by other means. He moved the court to take judicial notice that there were two open Kenosha County felony cases against John Stuart at the time he was cooperating with the prosecution. The court denied the motion, stating that the "jury will be informed that John Stuart had four prior convictions, and that will be the end of what we know about John Stuart." Lead op., ¶ 16.

¶ 71. Paul Stuart was eventually convicted.

¶ 72. Two years later, claiming newly discovered evidence, Paul's attorney arranged for John to be brought to Kenosha from the Waupun Correctional Institution for a post-conviction hearing. The following exchange occurred:

Mr. McLinden: Did your brother Paul tell you at Waupun words to the effect, quote, hey, I never told you that I shot that guy, how could you do this to me, close quote? And did you tell your brother Paul words to the effect, quote, I know you didn't shoot him but it was the only way they would drop the charges against me, close quote?

Mr. Stuart: You have part of that right and part of that wrong. The part about Paul stating that he said to me that I never shot that man, he did say the words to me while I was walking back from school. . . . And Paul did state what you just said, but my comments back to him was I'm sorry about what happened but that's what happened and you know what happened and I'm not going to buy 11 years to lie for you so you can go free and I have to do another 11 years, one being five years for perjury and the other six years added on for repeater . . . .

. . . .

Mr. Stuart: I love my brother, but he's going to have to stand up to the fact that he did what he did and you cannot continue trying to bring others down for him.

I already bought two years already. The judge himself knows that he had to

688

hit me with contempt of court, and I already bought two years for trying to help him [Paul] in the first place and I'm not going to buy no more. And I'm being honest. I'll put my hand on a Bible and I'll take a lie detector test. (Emphasis added.)

¶ 73. This later testimony of John Stuart completely confirmed the State's suspicions about John's motivation for making himself unavailable at his brother's trial.

II

¶ 74. In *Crawford,* the Supreme Court held that an out-of-court statement that qualifies as testimonial is not admissible under the Confrontation Clause, unless (1) the witness is unavailable; and (2) the defendant had a prior opportunity to cross-examine the witness. In this case, there is no dispute that the witness, John Stuart, made himself unavailable. There is also no dispute that the defendant cross-examined the witness at the preliminary examination. The issue is whether the prior cross-examination presented an adequate opportunity to cross-examine, in conformity with standards described in *Mancusi v. Stubbs,* 408 U.S. 204, 213–16 (1972), *California v. Green,* 399 U.S. 149, 165–68 (1970), and *Pointer v. Texas,* 380 U.S. 400, 406–08 (1965).

¶ 75. This court properly concludes that the defendant's confrontation rights were violated because he did not have adequate opportunity for cross-examination.

¶ 76. In hindsight, the State had the benefit of this court's ruling on the preliminary examination testimony. It did not have to develop a new theory to justify the admissibility of John's testimony, because it

could rely on our ruling plus *Ohio v. Roberts,* 448 U.S. 56 (1980), and *State v. Bauer,* 109 Wis. 2d 204, 325 N.W.2d 857 (1982).

¶ 77. In my view, the State could have argued that John Stuart's preliminary examination testimony was admissible because of the transparent collusion between the witness and the defendant. The judicial system cannot be rendered powerless to deal with wrongdoing designed to benefit a defendant on trial.

¶ 78. The Supreme Court has explicitly recognized this situation. *See State v. Hale,* 2005 WI 7, ¶¶ 91–98, 277 Wis. 2d 593, 691 N.W.2d 637 (Prosser, J., concurring) (citing *Crawford,* 541 U.S. at 62 and *Reynolds v. United States,* 98 U.S. 145, 158–59 (1878)).

¶ 79. Confrontation rules may be relaxed in situations where the defendant forfeits the right to cross-examination by wrongdoing or collusion.

¶ 80. Here the witness was the defendant's brother. He met with the defendant's attorney and/or his representative for several hours immediately before and during trial. He told the court he was "advised" to plead the Fifth Amendment. The State offered use immunity so that the witness had no legitimate fear of prosecution for anything other than perjury. Still he would not testify. It is very hard to imagine that the witness would not have testified if the defendant had not been a brother whom he either loved or feared.

¶ 81. This case is exceptional and permits a departure from the strict rules of *Crawford,* yet the circuit court's denial of the defendant's motion to impeach the witness was an error too serious to ignore under *Harvey.* Had the defendant's motion to impeach his brother's credibility through third parties been granted, I would be voting differently, not because the error would have been harmless but because there would

690

have been no error. To conclude otherwise would undermine the fact-finding process in our judicial system.

¶ 82. I therefore respectfully concur.

¶ 83. LOUIS B. BUTLER, JR., J. (*concurring*). I join the decision and the mandate of the court. I agree with the court's interpretation and analysis of the Confrontation Clause under the facts of this case. While I disagree with the majority's statement of the harmless error test for the reasons stated in part II of my concurrence in *State v. Hale,* 2005 WI 7, 277 Wis. 2d 593, 691 N.W.2d 637, I agree with its application of the harmless error analysis in this case. I also conclude that the State has failed to meet its burden beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. I therefore respectfully concur.

¶ 84. JON P. WILCOX, J. (*dissenting*). I dissent. As I explained in my concurrence in *State v. Hale,* 2005 WI 7, ¶¶ 86–90, 277 Wis. 2d 593, 691 N.W.2d 637, the proper method for assessing harmless error for Confrontation Clause violations in the aftermath of *Crawford v. Washington,* 541 U.S. 36 (2004), is the test set forth by the United States Supreme Court in *Neder v. United States,* 527 U.S. 1, 18 (1999), which was adopted by this court in *State v. Harvey,* 2002 WI 93, ¶ 47, 254 Wis. 2d 442, 647 N.W.2d 189. As this court explained in *Harvey,* 254 Wis. 2d 442, ¶ 47, the formulation of harmless error in *Neder* was a clarification of the test for harmless error described in *Chapman v. California,* 386 U.S. 18 (1967). "[I]n order to conclude that an error 'did not contribute to the verdict' within the meaning of *Chapman,* a court must be able to conclude 'beyond a reasonable doubt that a rational jury would have found

the defendant guilty absent the error.' " *Harvey,* 254 Wis. 2d 442, ¶ 48 n.14 (quoting *Neder,* 527 U.S. at 18).

¶ 85. The test for harmless error as set forth in *Neder* has been applied to Confrontation Clause violations by this court in *State v. Weed,* 2003 WI 85, ¶¶ 28–29, 263 Wis. 2d 434, 666 N.W.2d 485, and more recently by the Seventh Circuit Court of Appeals in *United States v. Gilbert,* 391 F.3d 882, 884 (7th Cir. 2004). I see no reason to deviate from this test when analyzing *Crawford* Confrontation Clause violations.

¶ 86. I agree with Justice Crooks' analysis of the evidence in this case and his conclusion that the error here was harmless under *Neder.* Justice Crooks' dissent, ¶ 98. In light of the testimony from five separate witnesses that Paul Stuart admitted to shooting Gary Reagles, "it is 'clear beyond a reasonable doubt that a rational jury would have convicted absent the error' " and that therefore "the error did not ' "contribute to the verdict" '" obtained. *Weed,* 263 Wis. 2d 434, ¶ 29 (quoting *Neder,* 527 U.S. at 15, 18). Simply put, the State presented consistent, cumulative, and compelling evidence that Stuart killed Reagles.

¶ 87. I am authorized to state that Justice N. PATRICK CROOKS joins this dissent.

¶ 88. N. PATRICK CROOKS, J. (*dissenting*). I strongly disagree with the majority that the petitioner, Paul J. Stuart, is entitled to a new trial. In order to arrive at that holding, the majority has to dismiss the consistent testimony of five witnesses, each one having testified at trial that Paul Stuart admitted that he killed Gary Reagles. Although I agree that the admission of his brother John Stuart's preliminary hearing testimony violated the petitioner's right to confrontation under *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct.

1354 (2004), I conclude that the error under the circumstances in this case was clearly harmless.

¶ 89. "The hallmark of reliability is the consistency of facts and details." *United States v. Zehm,* 217 F.3d 506, 514 (7th Cir. 2000). Here, five prosecution witnesses, in addition to John, were consistent in their testimony that Paul Stuart admitted to shooting Gary Reagles. One of the most notable witnesses to testify against Stuart at trial was Arthur Parramoure. He accompanied Stuart on a trip to Arizona, which took place a few days after the death of Reagles. He testified that Stuart had decided, on the spur of the moment, that they should leave early on the trip. Parramoure stated that during this trip, Stuart admitted to shooting Reagles, because Reagles could not pay for a gun Stuart had sold him. Stuart admitted during his testimony at trial, that he had confessed to Parramoure, but claimed that he did so in order to frighten Parramoure.

¶ 90. Michael Schultz also testified at trial that Stuart admitted to shooting Reagles. The night after the shooting, Schultz encountered Stuart in a bar and overheard Stuart admit that he had killed Reagles. Schultz stated that he saw Stuart with Reagles in the same bar on the night of the shooting.

¶ 91. David Small testified at trial that Stuart talked about the shooting while the two men shared a cellblock. Stuart told Small that he was in jail for murder, and that he had shot a man in the chest with a .9 millimeter gun. Stuart talked about the gunpowder found on the victim's hands and by his feet, and then said that he had made Reagles' death look like a suicide.

¶ 92. Benjamin Woody also shared a cellblock with Stuart. He too testified at the trial that Stuart stated that the killing of Reagles had been initially ruled a suicide. Stuart commented to Woody about the

lack of physical evidence that the State had against him. Stuart then stated that he shot Reagles, and that he would do it again.

¶ 93. Finally, Damian Simpson testified at the trial that while Simpson shared a cellblock with Stuart, Stuart admitted to shooting Reagles. Simpson overheard another inmate ask Stuart whether he had shot the man he was in jail for murdering. Stuart replied that he killed him, and that he would do it again.

¶ 94. The majority relies on the harmless error test outlined in *Chapman v. California,* 386 U.S. 18 (1967), in order to hold that the *Crawford* violation was not harmless. There, the United States Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24. I am satisfied that the alternative wording in *Neder v. United States,* 527 U.S. 1, 2–3 (1999), *State v. Weed,* 2003 WI 85, ¶ 29, 263 Wis. 2d 434, 666 N.W.2d 485, and *State v. Harvey,* 2002 WI 93, ¶ 48, n. 14, 254 Wis. 2d 442, 647 N.W.2d 189, sets forth the applicable test. Under either test, however, the error here was harmless.

¶ 95. In attempting to apply the *Chapman* test, the majority undertakes a lengthy analysis involving factors such as the frequency of the error, the importance of the erroneously admitted evidence, the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence, whether the erroneously admitted evidence duplicates untainted evidence, the nature of the defense, the nature of the State's case, and the overall strength of the State's case. Majority op., ¶¶ 41, 43–58. As noted previously, both this court and the United States Supreme Court have analyzed harmless error by utilizing a more recent

alternative test. *See Neder,* 527 U.S. 1; *Weed,* 263 Wis. 2d 434; and *Harvey,* 254 Wis. 2d 442. Rather than undertake the lengthy approach of the majority, this court should consider only the error's effect on the jury verdict in light of the fact that five additional witnesses provided testimony, consistent with the testimony of John Stuart, that Paul Stuart admitted his guilt to them. If "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained,' " then the error was harmless. *Weed,* 263 Wis. 2d 434, ¶ 29 (citation omitted). In order to hold that an error was harmless, a court must be able to conclude " 'beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *Id.; see also Neder,* 527 U.S. at 18. I am satisfied that whichever test is applied that the facts of this case establish that the *Crawford* confrontation error was harmless, given the overwhelming evidence of Stuart's guilt with or without his brother John's testimony.

¶ 96. The testimony of the five additional witnesses was persuasive and consistent with John's preliminary hearing testimony that Paul Stuart admitted killing Reagles. John's testimony was, in effect, "frosting on the cake." It was nice to have, but not necessary to establish that Paul Stuart killed Gary Reagles.

¶ 97. The majority attempts to inflate the importance of John's testimony and attempts to minimize the importance of Arthur Parramoure's testimony, as well as the testimony of the other prosecution witnesses. The record reflects that the jury requested that Parramoure's testimony, along with the testimony of John, be read back to them. The jury rendered a verdict of guilty soon after the reading was completed. This time sequence clearly demonstrates that the jury found

Parramoure's testimony material, persuasive, and consistent with the other witnesses' testimony.

¶ 98. The *Crawford* violation was harmless error under *Weed, Neder, Harvey,* and *Chapman.* Even without John's testimony, the State presented an overwhelming case in regard to Paul Stuart's guilt. It appears clear that the jury relied on the consistent testimony of the five additional witnesses, and placed special importance on Parramoure's testimony. I have no difficulty concluding " 'beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *Weed,* 263 Wis. 2d 434, ¶ 29 (citation omitted). Therefore, I conclude that the *Crawford* confrontation error was harmless, and that the petitioner, Paul Stuart, is not entitled to a new trial.

¶ 99. For the above stated reasons, I respectfully dissent.

¶ 100. I am authorized to state that Justices JON P. WILCOX and PATIENCE DRAKE ROGGENSACK join this dissent.